UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ELLEN OKOLITA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00284-LEW |
| | ) | |
| AMAZON.COM, INC., | ) | |
| AMAZON.COM SERVICES LLC, | ) | |
| WALMART.COM USA, LLC, | ) | |
| WALMART, INC., and EBAY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON eBAY'S
MOTIONS TO DISMISS**

In this action, Plaintiff Ellen Okolita, a Maine artist, alleges that the Defendants, providers of online marketplaces, are liable to her under the Copyright Act for enabling foreign counterfeiters to use the Defendants' marketplaces to trade in knockoff goods (copies of goods Okolita designed) using Okolita's own copyrighted photographs of the original goods.  The matter is before the Court on the Motion to Dismiss (ECF# 37) filed by Defendant eBay.  Through its motion, eBay argues that Okolita's allegations are insufficient to support a claim for direct or secondary liability and that her First Amended Complaint should, therefore, be dismissed.  eBay's motion is granted in part.

**Background**

The following facts are drawn from the First Amended Complaint ("FAC").  They are presumed to be true for present purposes.  *Barchock v. CVS Health Corp.*, 886 F.3d 43,

1

48 (1st Cir. 2018) ("We take the complaint's well-pleaded facts as true, and we draw all reasonable inferences in the plaintiffs' favor.").

In 2014, Ellen Okolita began a creative endeavor sewing bird costumes for children. Before long, the creative endeavor became a business venture. To date, Ms. Okolita has sold around 8,000 costumes to customers all over the world through her Etsy shop, where she advertises the products with a series of photos of her children wearing the costumes.

Ms. Okolita holds valid copyright registrations for each of the photographs that she uses to advertise her costumes on her Etsy site. Ms. Okolita has applied for, and is actively pursuing, copyright registration for her Hummingbird costume, which remains pending. Ms. Okolita has never sold any of her bird costumes on eBay. Consequently, she has never advertised any of her bird costumes by posting her photographs of the costumes on eBay. Ms. Okolita has never granted eBay a license to reproduce, distribute, or display her copyrighted photographs, or to prepare derivative photoshopped images that are substantially similar to her copyrighted photographs. Ms. Okolita has never granted eBay permission to copy, display, reproduce or distribute her copyrighted photographs or to prepare derivative images that are substantially similar to her copyrighted photographs.

On August 16, 2021, Ms. Okolita discovered that lesser quality, counterfeit copies of her costumes were advertised on eBay (www.ebay.com) by third party merchants, all of whom were using the photographs of her own children wearing the costumes, or images substantially similar to these photographs, to sell counterfeit versions of her costumes online. Ms. Okolita promptly contacted eBay to inform them that third-party merchants based in China were listing counterfeit copies of her costumes for sale and were using

2

photographs of her own children, which photographs had been copied and photoshopped without her knowledge or consent, to advertise the costumes.  Ms. Okolita asked that the listings be removed immediately.  eBay took no action in response to Ms. Okolita's initial request.

Ms. Okolita promptly filed applications with the U.S. Copyright Office to register the photographs of the costumes, the photographs of her children wearing the costumes, the Hummingbird costume that she had created, and the advertising copy that she had been using to market her costumes.  After receiving valid copyright registrations for each of the photographs at issue as well as the advertising copy, Ms. Okolita again notified eBay that numerous third-party merchants whose true identities were unknown to her were engaging in copyright infringement by using her protected photographs to advertise and promote the sale of counterfeit copies of her costumes through eBay's online shopping platform.

Eventually, after Ms. Okolita made multiple takedown requests through her counsel, eBay removed some of the listings that contained photoshopped images substantially similar to her copyrighted photographs.  However, within days multiple listings that infringed on Ms. Okolita's copyright registrations reappeared on eBay.  Initially, these appeared to be posted by different third-party merchants.  More recently, however, the same third-party merchants who had infringed Ms. Okolita's valid copyrights have relisted counterfeit copies of her costumes, along with images substantially similar to the copyrighted photographs.

Merchants who operate on eBay's online shopping platform do so with eBay's knowledge and consent, and at eBay's invitation.  As alleged, eBay substantially assisted

these third-party merchants in their copyright infringement by creating an online marketplace where these merchants can freely advertise counterfeit costumes, while using Ms. Okolita's copyrighted photographs for marketing purposes.  eBay provided the copyright infringing merchants with server space, virtual storefronts to advertise their goods, and written advice on how to become a successful online merchant.  eBay's marketplace, as alleged, offers a partnership to third-party merchants, inviting them to register as sellers, launch their online retail businesses, and rely on eBay to secure direct access to a significant global customer base.

eBay derives substantial profits from sales realized by third-party merchants on its online global marketplace, ebay.com. Unlike Amazon and Walmart, eBay does not post goods for sale on its online shopping platform. The only items offered for sale on ebay.com are sold by third-party merchants, without whose participation eBay would not experience any commercial success.  eBay charges significant fees to third-party merchants along multiple categories and tiers of listings.

Under the terms of the eBay User Agreement, attached to the FAC as Exhibit Q, third party merchants "represent and warrant that, for all such content [they] provide, [they] own or otherwise control all necessary rights to do so . . . and represent and warrant that such content is accurate."  Exhibit Q, pp. 6-7, ¶ 9.  The eBay User Agreement provides: "Content that violates any of eBay's policies may be modified, obfuscated, or deleted at eBay's sole discretion." *Id.*, p. 4, ¶ 6.  eBay exercises control over its global marketplace and has the right and the ability to remove copyright infringing content at any time in its discretion.  eBay has also implemented a Digital Millennium Copyright Act (DMCA)

4

policy.  Exhibit Q, p. 7, ¶ 10.  Ms. Okolita alleges that eBay's DMCA policy is not equal to the task of stopping copyright infringers from repeatedly posting advertising content that has previously been flagged for eBay as copyright protected material.  Despite Ms. Okolita's multiple takedown requests made through counsel after valid copyright registrations were obtained for the photographs and advertising copy, photoshopped images substantially similar to Ms. Okolita's copyright protected photographs continue to appear on ebay.com.  Copies of infringing content retrieved by Ms. Okolita are attached as Exhibit R to the FAC.

As alleged, eBay has failed to implement working systems to ensure that copyright holders can submit notices of infringement and takedown requests without encountering technical difficulties and failed to act expeditiously to remove or disable access to copyright infringing materials posted on its e-commerce platform by unscrupulous third-party merchants dealing in counterfeit goods.  Instead of removing the copyright infringing content reported by Ms. Okolita, eBay continued to provide third-party merchants with a vehicle to advertise counterfeit costumes sold at a fraction of the price advertised by Ms. Okolita for her original costumes, using her copyright protected photographs; participated in joint commercial enterprises by providing third-party merchants with business advice, selling and delivering their counterfeit costumes for them, and posting Ms. Okolita's copyright protected photographs on its online shopping platform, either directly or indirectly, to ensure the sale of the costumes; ignored Ms. Okolita's takedown requests; and derived continued profits from the sale of the counterfeit costumes through the advertising use of Ms. Okolita's copyright protected photographs.

The balance of Ms. Okolita's allegations are a cacophony of allegations that, predominantly, describe in opprobrious language eBay's and the other Defendants' awareness of infringement on their platforms and their inaction (or ponderously slow, indifferent, and ineffectual action) in response to it, ostensibly for the passive realization of additional revenue or, more scandalously, with the actual intent of fostering a thriving marketplace in counterfeit products ("aid[ing] and abet[ting]" in Ms. Okolita's words, FAC ¶ 138). In a nutshell, Ms. Okolita contends that the Defendants have failed to implement reasonably effective takedown procedures despite having the means, right, and obligation to do so. She also alleges that what takedown remedies exist on Defendants' platforms "are essentially meaningless," given the ubiquity and whack-a-mole nature of the counterfeiter/infringer activity across these platforms. FAC ¶ 133. Even if a creator can find an instance of infringement, she cannot know that she has found them all and must anticipate new infringement on a perpetual basis.

## Legal Background

"Copyright protection 'subsists ... in original works of authorship fixed in any tangible medium of expression.'" *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984) (quoting 17 U.S.C. § 102(a)). The owners of copyrighted works enjoy several legal protections, including the exclusive rights to reproduce the work, prepare derivative works, and publicly display the work. 17 U.S.C. § 106. "Anyone who violates any of the exclusive rights of the copyright owner . . .  is an infringer of the copyright . . .." 17 U.S.C. § 501 (a).

"The Copyright Act provides the owner of a copyright with a potent arsenal of remedies against an infringer . . ., including an injunction to restrain the infringer from violating [her] rights, . . . a recovery of [her] actual damages and any additional profits realized by the infringer or a recovery of statutory damages, and attorneys fees." *Sony Corp.*, 464 U.S. at 433–34.  However, the copyright owner generally cannot file "a civil action for infringement of the copyright" unless the owner registers the work with the United States Copyright Office.  17 U.S.C. § 411(a).  The Copyright Act also conditions certain remedies on the timeliness of registration.  *Id.* § 412.

When it comes to "contributory" infringement, "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another." *Sony Corp.*, 464 U.S. at 434.  Nonetheless, "[t]he absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity." *Id.* at 435.  "For vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another." *Id.*  The boundaries of liability for contributory infringement—sometimes called secondary infringement—are, for the most part, described in two Supreme Court cases: *Sony Corporation of America v. Universal City Studios*, *Inc.*, and *Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, *Ltd*.

The Plaintiff in *Sony Corp.*, Universal City Studios, argued that Sony, as maker of the Betamax cassette player and tapes, was liable to it under a theory of contributory

copyright infringement based on the acts of Sony customers who used the Betamax system to record and publish motion pictures. Universal contended that Sony had actively encouraged its Betamax customers to infringe by both supplying the means to infringe and advertising the features of the Betamax system that enabled such use. *Id.* at 436.

The Supreme Court held that Universal's argument rested on a "gross generalization that cannot withstand scrutiny." *Id*. (5-4) (reversing the Ninth Circuit's imposition of contributory liability). Key to its determination was the fact that Sony did not supply its customers with any copyrighted works, only the means to record and display them; the customers had to acquire and display the copyrighted works on their own. *Id.* The Court explained that liability for contributory infringement requires more if it is to be just; the contributory infringer must be "in a position to control the use of copyrighted works by others" and "authoriz[e] the use without permission from the copyright owner." *Id.* at 437. Given the facts and circumstances associated with Betamax usage, these tandem requirements (along with other considerations[1]) were the death knell of Universal's case against Sony. *Id.*

---

[1] The Court also discussed a doctrine of patent law known as the "staple article of commerce doctrine," which states "that distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, *Ltd*., 545 U.S. 913, 932 (2005) (summarizing the *Sony* opinion). "The doctrine was devised to identify instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement." *Id.* Much of the record developed in the district court for the *Sony* matter related to the many noninfringing uses of the Betamax technology, including copying of programming authorized by many holders of copyrights so that television viewers could record and then view their content at times outside of the networks' programming schedules. *Sony Corp.*, 464 U.S. at 443-46 (1984).

Twenty years later, the Supreme Court considered a different technology—peer-to-peer file sharing networks—in what would prove to be a closer case from a legal standpoint. In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, *Ltd*., Metro-Goldwyn-Mayer and other studios sued Grokster and Streamcast, alleging that their peer-to-peer software was distributed to users knowingly and intentionally to facilitate copyright infringement.  545 U.S. 913, 920 (2005).   The Court acknowledged that the peer-to-peer technology was "employed to store and distribute electronic files by universities, government agencies, corporations, and libraries, among others," *id.* at 920, but reviewed a record focused on the defendants' own networks of users, who "prominently employed those networks in sharing copyrighted music and video files without authorization."  *Id.*

The Court announced the issue and stated its holding at the outset:

> The question is under what circumstances the distributor of a product capable of both lawful and unlawful use is liable for acts of copyright infringement by third parties using the product. We hold that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

*Id.* at 918-19. The Court's determination to recognize a theory of liability based on promotion of copyright infringement rested in part on the fact that discovery showed the defendants' networks were utilized for little else (as measured by the volume and kind of files shared by their users).  Additionally, the record was "replete with evidence that from the moment Grokster and StreamCast began to distribute their free software, each one clearly voiced the objective that recipients use it to download copyrighted works, and each took active steps to encourage infringement."  *Id.* at 923-24.  Beyond the "evidence of

express promotion, marketing, and intent to promote further, the business models employed by Grokster and StreamCast confirm[ed] that their principal object was use of their software to download copyrighted works." *Id.* at 926. "Finally, there [was] no evidence that either company made an effort to filter copyrighted material from users' downloads or otherwise impede the sharing of copyrighted files." *Id.*

The Supreme Court described the overarching challenge as a task of "managing the tradeoff" between protection of artistic expression and fostering technological innovation. *Id.* On the facts before it, the Court found a "powerful" argument for permitting "indirect liability." *Id.* at 929. Of concern, too, was the difficulty of going after the individual direct infringers. "When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement." *Id.* 929-30. The Court sketched out the parameters for indirect liability based on two theories (contributory and vicarious liability): "One infringes contributorily by intentionally inducing or encouraging direct infringement and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Id.* at 930 (citations omitted). The Court then went on to discuss the case exclusively in terms of the contributory liability theory, without purporting to restrict the vicarious liability theory by so doing.[2] *Id.* at 930 n.9.

---

[2] In support of its formulation of the vicarious liability standard, the Court cited *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (C.A.2 1963).

After relating the facts underlying its *Sony* opinion, the Supreme Court rejected the idea that *Sony* was a sufficient and adequate precedent to address the newfound circumstances. *Id.* at 933-34. The Court stated that it would not fuss with *Sony* "to add a more quantified description of the point of balance between protection and commerce when liability rests solely on distribution with knowledge that unlawful use will occur," and would "leave further consideration of the *Sony* rule for a day when that may be required." *Id.* at 934. Enshrining (or, more accurately, updating) a new rule of "fault-based liability" for infringement, the Court authorized copyright liability for cases in which the "evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement." *Id.* at 935. More specifically, the Court held "that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.* at 936-37. However, the Court cautioned that "just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability." *Id.* at 937 (citation omitted). Thus, "ordinary acts incident to product distribution, such as offering customers technical support or product updates" will not afford a basis for liability. *Id.* "The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise." *Id.* But to be clear, "[p]roving that a message [of

inducement] was sent out . . . is the preeminent but not exclusive way of showing that active steps were taken with the purpose of bringing about infringing acts, and of showing that infringing acts took place by using the device distributed." *Id.* at 938. The Court remanded the case for further review based on the strength of three core factors: (1) that each company demonstrated (indeed announced) its intent to meet the demand for software that would enable copyright infringement; (2) that "neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software"; and (3) that the extent of the infringing use correlated with company profit, though the third factor "alone would not justify an inference of unlawful intent" without the others. *Id.* at 939.

With this we have what amount to two distinct theories of indirect or secondary copyright infringement liability: a contributory theory and a vicarious liability theory. The latter theory has not yet been elaborately outlined by the Supreme Court, as the Court side stepped it in *Grokster*. The Court did, however, site a 1963 opinion of the Second Circuit, *Shapiro*, *Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963), and formulated the following basic standard: "One . . . infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930.

The defendant-appellee in *Shapiro*, the five and dime store chain H.L. Green, contracted with the Jalen Amusement Company, which "operated [Green's] phonograph record department as concessionaire." *Id.* at 306. Jalen, it turns out, cut its own phonographs containing disklegged (bootlegged) recordings of popular songs of the day.

The district court, following a trial, dismissed the copyright claim against Green, finding that Green had not participated in the sales and had no knowledge of the infringing nature of the phonographs.  *Id.*  However, the Second Circuit reversed and held that, as a matter of law, certain facts of record established Green's liability.  *Id.*  Among these was Green's contractual entitlement to a percentage of Jalen's gross receipts and Green's initial retention of gross receipts in its own registers; Green's retention of "the ultimate right of supervision over the conduct of the record concession and its employees"; Green's arrangement of accounting for the payment of wages to Jalen's employees; the absence of any identification of Jalen as the seller within Green's stores; and the issuance of purchase receipts that exclusively identified Green as seller.  *Id.* at 306, 308.  The court relied on principles of agency and an older line of "dance hall cases,"[3] *id.* at 307-308, to impose liability on Green, holding that "[w]hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monopoly is being impaired—the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation."  *Id.* at 307 (citation omitted).  The court acknowledged that the imposition of liability in the absence of demonstrated intent or knowledge can be harsh but explained that such a rule was required to honor the copyrights of creators who were powerless to prevent the direct infringement other than through litigation.  *Id.* at 308

---

[3] Dance hall cases involve "the proprietor or manager of a dance hall or music hall leasing his premises to or hiring a dance band, which brings in customers and profits to the proprietor by performing copyrighted music but without complying with the terms of the Copyright Act."  *Shapiro*, 316 F.2d at 307.

("Green has the power to police carefully the conduct of its concessionaire Jalen; our judgment will simply encourage it to do so, thus placing responsibility where it can and should be effectively exercised.").[4]  Although *Shapiro* is the oldest of the cases that bear on our present controversy, *Shapiro* is the most analogous.

In addition to the foregoing precedent, the present inquiry is further impacted by the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201, *et seq*.  Congress enacted the DMCA in 1998 "to implement the World Intellectual Property Organization Copyright Treaty and to update domestic copyright law for the digital age."  *Viacom Int'l, Inc. v. YouTube, Inc*., 676 F.3d 19, 26 (2d Cir. 2012) (quotation marks and citation omitted).  The DMCA encompasses another enactment, the Online Copyright Infringement Liability Limitation Act (Title II of the DMCA), through which Congress sought to "clarif[y] the liability faced by service providers who transmit potentially infringing material over their networks."  S. Rep. No. 105–190 at 2 (1998).  With the DMCA Congress did not attempt to redefine or redirect the development of copyright law, but instead created a set of safe harbors that enable online service providers to limit liability for copyright infringement occurring on their online systems, whether existing law would hold them accountable as infringers or not.  *Id.* at 19.

As codified at 17 U.S.C. § 512, Title II identifies "five general categories of activities" for which service providers will be shielded from "all monetary relief for direct,

---

[4] *See also Perfect 10*, *Inc. v. Amazon.com*, *Inc*., 508 F.3d 1146, 1171 n. 11 (9th Cir.2007) ("[C]opyright holders cannot protect their rights in a meaningful way unless they can hold providers of such services or products accountable for their actions.")

vicarious and contributory infringement" and for which injunctive relief will be limited in scope.  S. Rep. No. 105-190 at 19-20.  According to Congress, "Title II preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment" and simultaneously "provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities."  *Id.* at 20.

For present purposes, the relevant safe harbor is one that applies to "information residing on systems or networks at [the] direction of users."  17 U.S.C. § 512(c).  Under the subsection (c) safe harbor, a provider has no monetary liability and only limited injunctive relief is available to a copyright holder if infringement occurs "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," where the provider can demonstrate compliance with three conditions:

> (1)  the provider "does not have actual knowledge that the material or an activity using the material on the system or network is infringing;" or lacking such knowledge, "is not aware of facts or circumstances from which infringing activity is apparent;" or "upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;"
>
> (2)  the provider "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity;" and
>
> (3)  "upon notification of claimed infringement [meeting certain statutory specifications], responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."

17 U.S.C. § 512(c)(1)(A)-(C)[5]; *see also id.* § 512(c)(3) (specifying the elements of a proper notification of claimed infringement).  In addition, access to this safe harbor requires that the service provider "has designated an agent to receive notifications of claimed infringement . . . by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office," information adequate to ensure the agent can be contacted by mail, phone, and e-mail. *Id.* § 512(c)(2).[6]

Whether a defendant can take shelter in a safe harbor does not appear to be a matter that a plaintiff must plead around.  Instead, the safe harbors provide an affirmative defense. *Soc'y of Holy Transfiguration Monastery*, *Inc. v. Gregory*, 689 F.3d 29, 58 (1st Cir. 2012). Dismissal on that basis, in other words, is only available if access to the defense is obvious on the face of the plaintiff's pleadings.  *Aldahonda-Rivera v. Parke Davis & Co.*, 882 F.2d 590, 592 (1st Cir. 1989).

## ANALYSIS

In three counts, Ms. Okolita alleges that eBay is liable to her under the Copyright Act for (1) direct infringement, (2) contributory infringement, and (3) vicarious

---

[5] "[T]he nature of the removal obligation itself contemplates knowledge or awareness of specific infringing material, because expeditious removal is possible only if the service provider knows with particularity which items to remove."  *Viacom Int'l*, *Inc. v. YouTube*, *Inc.*, 676 F.3d 19, 30 (2d Cir. 2012) (further explaining that "actual knowledge" means subjective knowledge).

[6] Of likely relevance to Ms. Okolita's allegations, the DMCA also states that access to the subsection (c) safe harbor is not conditioned on "a service provider monitoring is service or affirmatively seeking facts indicating infringing activity," 17 U.S.C. § 512(m), provided that the service provider "has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and . . . accommodates and does not interfere with standard technical measures" designed to assist copyright holders "to identify or protect copyrighted works," *id.* § 512(i)(1)-(2).

infringement.  eBay argues that Ms. Okolita has failed to state a claim for which liability may be imposed on eBay because it is clear from the allegations that the persons who posted Ms. Okolita's photographs were third parties and because eBay responded to Ms. Okolita's takedown requests.  eBay Mem. at 2.

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  If the facts viewed in the light most favorable to the plaintiff do not show or permit a reasonable inference that the defendant is liable to the plaintiff, dismissal of the complaint is appropriate.  *Id*. ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.");  Fed. R. Civ. P. 12(b)(6).  Moreover, a plaintiff cannot presume to rely on conclusory recitations of the elements of a claim.  *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) ("We do not credit legal labels or conclusory statements, but rather focus on the complaint's non-conclusory, non-speculative factual allegations and ask whether they plausibly narrate a claim for relief.").  Whether the underlying factual allegations generate a plausible inference of liability in line with a complaint's conclusory legal allegations is a "context-specific" inquiry that "requires the court to draw on its judicial experience and common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## A.    Direct Infringement

"To establish copyright infringement, the plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that

are original.'" *Latin Am. Music Co. Inc. v. Media Power Grp.*, *Inc.*, 705 F.3d 34, 38 (1st Cir. 2013) (quoting *Feist Publ'ns*, *Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). More broadly, a plaintiff must allege facts showing that the defendant in question infringed one of the plaintiff's exclusive rights in her copyrights. *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). And more particularly, a plaintiff must generally plead in a manner that identifies the original work at issue, the plaintiff's ownership of the copyright in the work, the prior (prelitigation) registration of the work, and "copying of constituent elements of the work that are original." *Airframe Sys.*, *Inc. v. L-3 Comm'ns Corp.*, 658 F.3d 100, 105 (1st Cir. 2011) (quoting *Feist Publications*, *Inc. v. Rural Tel. Serv. Co.*, *Inc.*, 499 U.S. 340 (1991)).

Plaintiff has alleged that her photographs are original works and that she has ownership of a valid copyright in her photographs. She also has alleged registration in advance of litigation and some particulars of the underlying infringement that occurred on eBay's online marketplace. However, when it comes to the copying of her work or violation of another exclusive right such as public display, Plaintiff's FAC is long on accusation but devoid of facts tending to suggest a plausible basis for the imposition of direct liability on eBay. Ms. Okolita's allegations only confirm the basic fact that eBay did not post Ms. Okolita's photographs on its platform and was in the position of a service provider made aware by and reacting to notifications arriving from a copyright holder.

"While the Copyright Act does not require that the infringer know that he is infringing or that his conduct amounts to a willful violation of the copyright owner's rights, it nonetheless requires conduct by a person who causes in some meaningful way an

infringement." *CoStar Group*, *Inc. v. LoopNet*, *Inc*., 373 F.3d 544, 549 (4th Cir. 2004) (holding that "an ISP who owns an electronic facility that responds automatically to users' input is not a direct infringer"); *see also Gregory*, 689 F.3d at 58 n.19 ("Other courts similarly have noted the distinction between active, volitional involvement in infringement versus passive, mechanical, or habitual actions that produce an infringing result, the latter of which generally have been held not to trigger direct infringement liability.") (collecting cases); *BWP Media USA Inc. v. Polyvore*, *Inc*., 922 F.3d 42, 66-67 (2d Cir. 2019) (Newman, J., concurring) (describing the need for a showing of "volition" on the part of a service provider); *Parker v. Google*, *Inc*., 242 F. App'x 833, 836 (3d Cir. 2007) (adopting *Costar* formulation).

Ms. Okolita's allegations do not plausibly demonstrate volitional infringement on the part of eBay.  Accordingly, Count I will be dismissed.

## B.      Contributory Infringement

Mere knowledge that a technology may be employed by some users to infringe copyrights will not generate liability for a manufacturer or service provider when the technology is capable of being used for and is in fact generally used for noninfringing uses unless the defendant was both in the position to control the use and authorized the use in question.  *Sony Corp*., 464 U.S. at 436 (1984).  In the *Sony* sense of contributory infringement, Ms. Okolita's allegations are conclusory in nature and fall short of the plausibility standard.  Concerning ebay.com's technological capabilities, the only plausible inference is that it is capable of being used for and is generally used for noninfringing uses.  Furthermore, there is no plausible basis to infer from the facts alleged that eBay

preauthorized the use of Ms. Okolita's copyrighted works. Its conduct is in fact characterized by reaction to the infringing acts of third parties, not preauthorization of those acts.

One may also infringe contributorily "by intentionally inducing or encouraging direct infringement." *Grokster*, 545 U.S. at 930. Inducement or encouragement in the *Grokster* sense is a rule of "fault-based liability" involving evidence that "goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement." *Id.* at 935. Certainly Ms. Okolita alleges as much, writing that eBay aided and abetted the infringers, but she does so in a conclusory fashion. She has not alleged facts involving statements or actions that plausibly suggest that eBay promotes copyright infringement on the part of third parties using its marketplace. Moreover, eBay's "mere knowledge of infringing potential *or of actual infringing uses*" is not enough to subject it to contributory liability. *Id.* at 937 (emphasis added). This extends to eBay's knowledge (precipitated by takedown requests) that third party merchants were infringing Ms. Okolita's copyrights.[7]

---

[7] A line of cases address contributory liability arising from a provider's promotion of infringing material toward which the provider has demonstrated "willful blindness." *See, e.g.*, *BMG Rights Mgmt. (US) LLC v. Cox Communications*, *Inc.*, 881 F.3d 293, 308 (4th Cir. 2018). In such cases, the willful blindness standard provides plaintiffs with a method of showing a defendant's knowledge of infringement, where the proof of knowledge is a necessary component of proving the defendant's intent to promote infringement. Ms. Okolita includes a willful blindness allegation in her FAC under her contributory infringement claim. Here, however, the circumstances associated with eBay's knowledge of infringement involve eBay's general awareness that some of its users infringe copyrights with their listings. That knowledge is not actionable. *Grokster*, 545 U.S. at 937. Furthermore, as far as Ms. Okolita's copyrights are concerned, the allegations do not plausibly depict willful blindness on eBay's part. Instead, they depict specific knowledge gained by eBay in the wake of Ms. Okolita's takedown requests and eventual action taken by eBay in response to one or more of Ms. Okolita's requests. These allegations do not depict a plausible case of contributory infringement based on willful blindness. The vicarious liability model, on the other hand, is oriented to the efficacy of a provider's response to takedown requests, as discussed *infra*.

Ms. Okolita also emphasizes eBay's facilitation of infringement through technical support and marketing advice, going so far as to allege the existence of a partnership. However, "ordinary acts incident to product distribution, such as offering customers technical support or product updates" will not afford a basis for liability. *Id.* "The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise." *Id.*

Lastly, Ms. Okolita criticizes eBay for its realization of transactional proceeds due to the infringing activity of some users. But again, the allegations are not sufficient to state a plausible claim for relief based on contributory infringement. The mere fact that infringing use of the eBay marketplace generates revenue for eBay does not alone "justify an inference of unlawful intent." *Id.* at 939.

For the foregoing reasons Count II will be dismissed.

## C.   Vicarious Liability

Homing in on eBay's right and ability to supervise and control infringing activity conducted on its online marketplace, Ms. Okolita alleges in her third claim that eBay is liable to her for failing to stop and/or prevent ongoing incidents of infringement of her copyrights. To be vicariously liable for infringement, the facts need to demonstrate that eBay profited from the direct infringement of third-party users of its services "while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930.

This final claim satisfies the plausibility standard. It does so because the law suggests the need for consideration of the qualitative nature of eBay's response to Ms.

Okolita's takedown requests and eBay's knowledge and understanding of the infringers' conduct on its online marketplace. In the context of a motion to dismiss, a plausible claim is viable and an examination of the quality of eBay's response to Ms. Okolita's takedown requests is suited for a summary judgment record or trial. Moreover, to the extent eBay premises its motion to dismiss on the copyright safe harbor found in § 512(c), that entails a separate inquiry that arises in the context of an affirmative defense. Although the current record establishes that eBay has a § 512(c) policy (on paper) and that eBay did remove content that infringed Ms. Okolita's copyright(s), I am not persuaded that a review of Ms. Okolita's FAC and its attachments makes it obvious that eBay is sheltered by the safe harbor.

## D.   Limited Remedies

Ms. Okolita attached copies of her copyright registrations to her FAC. The registration certificates reflect that Ms. Okolita registered her copyrights in 2022, a few months after she discovered the infringing use of her photographs on eBay's online shopping platform and a few months before she filed suit in this action. Because the certificates of registration are attached to and incorporated into Ms. Okolita's FAC, they are part of the record associated with eBay's motion to dismiss. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 54 F.4th 42, 48 (1st Cir. 2022).

Under the Copyright Act, preregistration or registration of a copyright is required before commencing a civil action for infringement (except in an action for a violation of the rights of attribution and integrity associated with works of visual art). 17 U.S.C. §§ 106A(a), 411(a), 412. Additionally, the Act limits a copyright holder's access to certain

remedies when the copyright has not been registered before the commencement of the infringement, subject to limited exceptions not applicable here.  More specifically, "no award of statutory damages or of attorney's fees . . . shall be made for" infringement of an unpublished work when the infringement "commenced before the effective date of [the copyright's] registration," and no such award shall be made for infringement of a published work when the infringement "commenced after first publication of the work and before . . . registration, unless such registration is made within three months after the first publication of the work."  17 U.S.C. § 412.

eBay argues that Ms. Okolita's pleas for statutory damages and attorneys' fees should be dismissed because the record demonstrates that these remedies are not available under the Copyright Act.  eBay cites authority for the proposition that an award of these remedies cannot be based on new (post-registration) acts of infringement on its platform if they form part of a series of continuing infringement by the same infringer(s), which infringement commenced before registration of the copyrights.  Ms. Okolita disagrees that this is the appropriate time to evaluate the presumed continuation of infringement, but she does not otherwise contest eBay's characterization of the law.

Drawing all reasonable inferences in favor of Ms. Okolita, I find it plausible that circumstances may exist or arise that overcome eBay's commencement/continuation argument for the dismissal of Ms. Okolita's pleas for statutory damages and fees.

## CONCLUSION

For the reasons set forth above, eBay's Motion to Dismiss (ECF No. 37) is GRANTED IN PART and DENIED IN PART. Counts I and II are DISMISSED WITHOUT PREJUDICE.

**SO ORDERED.**

Dated this 28th day of July, 2023.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE